**Borough of Industry v. Allegheny Valley School**

*Alfred L. Steff, Jr.,* for plaintiff.
*James T. Collie,* for defendant.

MANNIX, *J.,* July 1, 1985—This matter is now before the court on the complaint in equity for permanent injunction filed by the Borough of Industry (hereinafter called boro) against Allegheny Valley School (hereinafter called A.V.S.). The boro seeks to enjoin A.V.S. from using two properties situated in the Borough of Industry as Intermediate Care Facilities for the Mentally Retarded. Boro initially sought a preliminary injunction which was denied by order of this court on June 4, 1985. A nonjury trial on plaintiff's complaint in equity was scheduled for June 25, 1985, at which time the parties offered no new evidence; rather, they submitted the records made at the preliminary injunction hearings on May 14 and May 31, 1985. In addition, the boro (without objection from A.V.S.) read into the record paragraph 13, contained in A.V.S.'s answer under the heading of new matter.

Defendant, A.V.S., is a nonprofit Pennsylvania corporation which undertakes the care, treatment

and education of mentally retarded individuals. It operates a residential facility for 160 individuals in Robinson Township, Allegheny County; a similar 57-bed facility in the Crafton-Ingram area of Allegheny County; and other small, single-family residences. Defendant purchased two properties in the Borough of Industry, proposing to use them as group homes or Intermediate Care Facilities for the Mentally Retarded.

One property, purchased from Albert A. and Mary R. Nutz, is located at 1111 Avondale Drive, which is zoned "R-3, Urban Residential District." The other property, purchased from Phyllis Nutz, is located on Barclay Hill Road in what is zoned "R-1, Rural Residential District."

The boro avers that A.V.S.'s proposed use of the two properties is improper and not permitted under the zoning ordinance of boro. Said boro contends that the proposed use could be permitted in the boro's "R-2, Suburban Residential District" as a special exception but not in the R-1 and R-3 districts. A.V.S. asserts that its use of the subject properties as group homes for mentally retarded citizens is proper in both R-1 and R-3 districts as the proposed use falls within the definition of "family" as found in the boro's zoning ordinance. Defendant contends that the group homes it hopes to operate in the boro are functional equivalents of biological families, behave in a substantially similar way to that of the typical family in a residential neighborhood, and would therefore be a permitted use as a "single-family detached dwelling" under the zoning ordinance.

The zoning ordinance of the boro divides the boro into seven districts: three residential, two commercial, one industrial and a special conservation district. "Single-family detached dwellings" are

principal uses in all three residential districts. "Nursing homes" are permitted as special exceptions only in the "R-2, Suburban Residential District." Section 401.11 of the zoning ordinance defines single-family dwelling as:

"[a] building designed for or occupied exclusively as a residence for only one family."

At section 401.17, "family" is defined as:

"[a]ny number of individuals living and cooking together in a single housekeeping unit, as distinguished from a group occupying a boarding house."

Section 401.32 defines "nursing, convalescent home or home for the aged" as:

"[a]ny dwelling with sleeping rooms where persons are housed or lodged and furnished with meals and nursing care for hire, or a home operated by a non-profit group and operated as an institution."

Institution is not defined in the zoning ordinance. Finally, "rooming house" is defined at section 401.40 as:

"[a] building on premises other than a hotel where lodging is offered by pre-arrangement for a definite period for compensation, of three or more persons, not open to transient guests, in contradiction to hotels, motels or tourist homes open to transients."

The boro's zoning ordinance in section 1001.1 states that a zoning permit is required when a building or structure is "erected, added to, or structurally altered." Section 1002.2 delineates the circumstances in which an occupancy permit is required:

"a. Occupancy of a new building.

b. Occupancy and use of a building hereafter moved or altered so as to require a zoning permit.

c. Change in the use of an existing building other than to a use of the same type.

d. Occupancy and use of vacant land.

e. Change in the use of land except to another use of the same type.

f. Any change in use of a nonconforming use." A.V.S. contends that, as no new construction or structural alterations are involved in the establishment of the group homes, section 1001 dealing with "zoning permits" is certainly inapplicable; and under section 1002.2(c), which deals with an "occupancy permit," said subsection states that such a permit is necessary when the use of an existing building is changed to another type or use. It is the position of A.V.S. that it is simply carrying on an existing and permitted use and therefore does not have to apply for either an occupancy permit or zoning permit.

A.V.S. also bases its right to use the subject properties without obtaining a permit on several recent cases decided by the Commonwealth Court. While no appellate court in Pennsylvania has ruled on the precise issue before us in this procedural context, namely, a complaint in equity for permanent injunction to enjoin the use of property in residential zoning districts as group homes for the mentally retarded, there is a series of cases that address similar issues and which are instructive in the present case.

Foremost among the cases relied on by A.V.S. (and the one closest to the factual scenario before us) is Hopkins v. Zoning Hearing Board of Abington Township, 55 Pa. Commw. 365, 423 A.2d 1082 (1980). Appellees sought to establish a household consisting of a houseparent, spouse and three mentally retarded children in a residential district through a program designed to place mentally retarded individuals into as nearly normal a family setting as possible. The applicable zoning ordinance defined family as:

"[o]ne or more persons related by blood, adoption or marriage, or not more than two unrelated persons living and cooking together as a single housekeeping unit." The court, in holding that there was no rational relationship between the restrictive definition of "family" and the state's interest and right to preserve the residential character of the neighborhood, stated that:

"Here, appellees seek to set up a family life as nearly normal as possible with the three handicapped children in their care. Appellees use of the property is consciously striving to mirror the residential family life that surrounds them and, in light of the board's finding, appears to have been successful. What we said in Children's Home is equally valid here, i.e., '[i]n sum, the foster family in this instance would be the functional equivalent of a biologically related family.'" (Citation omitted.) 55 Pa. Commw. at 369, 423 A.2d at 1084.

While the legal issue in Hopkins was the constitutional validity of the definition of "family" in the township's zoning ordinance, the factual setting and basic question presented are the same as those presently before this court; that is whether a household consisting of houseparent, spouse, natural born child or children and retarded individuals is a family.

The Children's Home case referred to in Hopkins is also cited by A.V.S. in support of its position. In Children's Home of Easton v. City of Easton, 53 Pa. Commw. 216, 417 A.2d 830 (1980), the Commonwealth Court found an ordinance banning a foster home from a residential-medium density zoning district arbitrary, unreasonable and unconstitutional where it was indicated that said home would be the "functional equivalent of a biologically related family" and would consist of foster parents, three

foster children and two natural children. In reaching this conclusion, the court, in Children's Home, relied on the continuity and normality of the proposed home:

"In the brief uncontradicted testimony presented to the trial court, the foster family proposed was described in all respects as akin to a 'natural' family. There would be no professional counselors involved, nor any 'days off' for the foster parents. The 'hope' would be that the foster children would remain in the home until graduation from high school. The foster parents would be expected to provide all the services that would have been expected from natural parents. They would serve in a nurturing, supervisory and caring role." 53 Pa. Commw. at 219-220, 417 A.2d at 832.

Finally, A.V.S. draws a distinction between the present situation and cases such as Owens v. Zoning Hearing Board of the Borough of Norristown, 79 Pa. Commw. 229, 468 A.2d 1195 (1983), and Appeal of Miller, 85 Pa. Commw. 407, 482 A.2d 688 (1984), which cases boro cites in its brief. Both of these cases involved homes in which seven unrelated adult boarders received meals, use of laundry facilities and lodging. The residents paid rent and were not permanent. The facts in Owens described a traditional boarding house in which residents did not receive nursing care or other medical services. Miller, however, concerned a personal care boarding house for those with physical and/or mental handicaps. In both cases, the court found that, as boarding houses, the dwellings constituted commercial uses and could be and were, in these cases, excluded from residential zoning districts.

Having considered the arguments of A.V.S. as to why its proposed use of the subject properties is that of a family living in a single-family residence under

the terms of boro's zoning ordinance, we now turn to boro's contention that A.V.S.'s proposed use must be characterized as commercial or institutional, not a single-family use as A.V.S. contends. If this is so, then as a commercial or institutional use, defendant's group homes would be excluded from both R-1, Rural Residential and R-3, Urban Residential districts as they now exist under boro's zoning ordinance. Boro cites Appeal of McGinnis, 68 Pa. Commw. 57, 448, A.2d 108 (1982), in asserting that a municipality may lawfully create residential zoning districts from which any and all commercial uses may be excluded. This is a correct statement of the law. However, it is difficult to relate the factual setting of McGinnis with that presently before us. In that case, appellant purchased residentially zoned property and established what was, in fact, a nursing home, albeit on a very small scale. The establishment was advertised as a "residential home" and residents were charged a daily fee for room, board and nursing care. Appellant was related to only one of the seven residents and the court noted that the home was a profit-making venture.

The boro also relied on Wengert v. Zoning Hearing Board of Upper Merion Township, 51 Pa. Commw. 79, 414 A.2d 148 (1980), in which the court held that a foster home for troubled adolescents who were referred by the courts, limited to six foster children attended to by two foster parents and one or more citizens, was not a permitted use in a single-family residential zoning district. Boro cites Wengert for the proposition that the availability of relief houseparents removes the proposed use from the definition of single-family dwelling. The assertion, however, ignores the other factors considered by the Commonwealth Court in reaching its conclusion in Wengert. Among these were: (1)

fireproofing of the basement, furnace and stairwells; (2) placement of fire doors on all stairwells; (3) installation of a fire escape and safety glass; and (4) the presence of, not only relief houseparents, but two other residential staff people, a consultant and a psychologist on the premises. The court also noted that the foster children were committed to the home by the court system in lieu of commitment to a "larger penal institution" and was "an alternative to institutionalizing them." 51 Pa. Commw. at 81, 414 A.2d at 149. Given these additional factors, it is clear to the court that Wengert is not controlling or even persuasive of the present factual situation.

The boro also contends that the case before us commands the same holding as Owens v. Zoning Hearing Board of Norristown Borough, supra. Even a cursory review of the facts in Owens, in which seven unrelated adult boarders signed contracts and paid rent to an absentee owner for a for-profit boarding house, convinces the court that the present case will not be governed by it.

During oral argument, boro averred that the fact that most of the proposed residents were adults should be a factor weighing against the inclusion of the proposed use under the definition of "family." We disagree. The ages of residents is irrelevant in determining whether or not they constitute a family. This court can envision many family situations wherein the household consists entirely of individuals other than children. Also there are many households in which the parents or eldest members of the family are not the ultimate decision-makers, such as when children or grandchildren are responsible for aged parents, uncles or aunts. At page five of its brief, boro contends that the residents' mental retardation "is and should be irrelevant" on the issue before us. This court agrees wholeheartedly. Thus,

neither age nor mental capacity of the proposed residents is a significant fact in determining whether a "family" exists under the definition of that word in boro's zoning ordinance.

It should be pointed out that what the court is ruling on is a group home for moderately or mildly retarded individuals. In response to a query from the court, counsel for A.V.S. stated that it would be impossible for A.V.S. to house severely mentally retarded individuals in group homes such as are involved here for it would not be permitted by the Pennsylvania Department of Public Welfare which regulates such programs. Although the court has no desire to pre-judge issues which are not before it at this time, we believe that a group home housing severely mentally retarded residents, with the requisite personal and medical care, rehabilitation and supervision, would not fall within the concept of single-family use which is what we are ruling on today.

As stated earlier in this opinion, if the proposed use of the subject properties by A.V.S. constitutes a family (as defined in boro's zoning ordinance) using a single-family dwelling (as defined in boro's zoning ordinance, no permit is required. On the other hand, if A.V.S.'s proposed use is determined to be commercial or institutional, then under the existing zoning ordinance said use cannot be conducted in the R-1 and R-3 zoning districts of the boro. When the court interprets a zoning ordinance provision controlling permitted uses, the landowner must be given the "benefit of the interpretation least restrictive of his use and enjoyment of his property". Laird v. City of McKeesport, 88 Pa. Commw. 147, 489 A.2d 942, 943 (1985). In general, restrictions imposed by zoning ordinances must be strictly construed, Constantino v. Borough of Forest Hills, 88

Pa. Commw. 306, 489 A.2d 968 (1985), and said restrictions "may not be construed so as to restrict the use of land by implication." Reed v. Zoning Hearing Board of West Deer Township, 31 Pa. Commw. 605, 608, 377 A.2d 1020, 1021 (1977).

Equity has the power to act only when no adequate remedy at law exists or when intervention is necessary to prevent irreparable harm. Pye v. Commonwealth Insurance Department, 29 Pa. Commw. 545, 372 A.2d 33, affirmed 479 Pa. 146, 387 A.2d 877 (1977). An injunction is an extraordinary remedy which is granted only with extreme caution, Pye, supra, and the issuance of an injunction rests with the sound discretion of the trial court. Commonwealth v. National Federation of the Blind, 471 Pa. 529, 370 A.2d 732 (1977).

With these rules and standards in mind, a detailed examination of the facts as established through testimony presented at the May 14 and May 31, 1985 hearings of how A.V.S. will carry out its proposed use of the subject properties is necessary. A.V.S. is currently in the process of closing a large institutional housing facility and distributing 132 individuals into approximately 23 group homes in the greater Pittsburgh area. The relocation program is being funded with both federal (55 percent) and state (45 percent) money. In looking for appropriate housing, the realtor was instructed to locate spacious, ranch-style homes with four bedrooms in "good quality" neighborhoods. No structural changes are planned for either home. Each home will be run by a houseparent who is an employee of defendant. The proposed houseparents are married and, generally, their spouses are employed outside the home. The Avondale Drive property would be occupied by a houseparent, spouse, their natural

child and six moderately retarded women in their early 20's. The Barclay Hill Road property would be occupied by a houseparent, spouse, their two natural children and four moderately retarded females, two in their early 20's and two of school age.

The houseparents live in the homes and are paid by defendant on the basis of a 40-hour work week. When hiring a houseparent, defendant evaluates the applicant's spouse since he or she would also be residing at the group home. Before establishing themselves in the group home, all participants would go through a training program. Each afternoon, support staff come into the group homes to provide supervision and during this time, the houseparents are permitted to leave if they so desire. Houseparents are free to leave the home from approximately 2:00 or 2:30 p.m. in the afternoon until 10:30 or 11:00 p.m. at night. Houseparents are expected to be in the house at night but can make arrangements to be absent overnight or on weekends as long as these time periods are covered by other support staff. At least one, and at the most two, support staff are in the group homes each day.

The retarded individuals which defendant plans to place in the group homes are "high functioning" people who hold jobs. Each morning the residents would be picked up by an A.V.S. van and taken to their place of employment, or, in the case of two school-age retarded children, to school. The residents are employed in somewhat sheltered environments and any money they earn is theirs to keep. Individually, they pay no rent or board to Allegheny Valley School.

While the group homes would be provided with 24-hour supervision, either by the houseparents or support staff, residents would be allowed to leave

the house to go to local stores and other locations in the neighborhood as would any other citizen. The houseparent would be responsible for the mentally retarded residents and would perform the same functions as a typical parent. The houseparent or support staff would cook for the entire household, which would function as an otherwise normal family — celebrating birthdays, attending church services, going to movies and restaurants and so forth.

While the present plans are to house only female residents at the subject properties, there would be nothing to prevent A.V.S. from assigning males to live there. Also, if a resident were to leave the group home permanently, A.V.S. would replace him or her with another mentally retarded person.

Is this mode of operation the functional equivalent of a biologically related family? Is it more like a foster home situation than a boarding home or institutional care facility? To aid the court in this decision, the interpretation of Hopkins and Children's Home as enunciated by the Commonwealth Court in Owens v. Zoning Hearing Board of Norristown Borough, supra, is significant:

"Citing Hopkins v. Zoning Hearing Board of Abington Township, 55 Pa. Commw. 365, 423 A.2d 1082 (1980), and Children's Home of Easton v. City of Easton, 53 Pa. Commw. 216, 417 A.2d 830 (1980), the owner asserts that her boarding house residents are the functional equivalent of a biologically related nuclear family and therefore cannot constitutionally be excluded from the R-2 residential district. In Hopkins and Children's Home of Easton we held that single family zoning ordinance provisions could not constitutionally prohibit unrelated foster children or mentally retarded chil-

dren from living with adult couples in a domestic environment substantially similar to that of the traditional nuclear family.

"In contrast to the nurturing, stable, permanent commitments embodied in the living arrangements of Hopkins and Children's Home of Easton, the adult boarders, sub judice, sign a renewable, monthly contract and pay rent for lodging and meals provided by a profit-seeking operator. Additionally each resident is free to leave at any time unencumbered by the social, moral and psychological bonds which, especially during child rearing years, characterize nuclear families. The living arrangements, therefore, of seven unrelated rent-paying, adult individuals residing temporarily in a for-profit boarding house vastly differ from that of the quasi-nuclear families of Hopkins and Children's Home of Easton and, as such, a different outcome is commanded." 79 Pa. Commw. at 232-233, 468 A.2d at 1197.

The effort of A.V.S. to remove moderately mentally retarded individuals from large institutional settings and place them in smaller, family situations is certainly consistent with the present aims of this Commonwealth. It is also consistent with appellate cases herein discussed. In reviewing the case law presented and applying it to our facts, we find defendant's argument that occupants of the respective properties will be the functional equivalent of a biologically related family to be persuasive and hold that defendant's proposed use falls within the definition of "family" under the borough's existing zoning ordinance. Therefore, it is a permitted use in both R-1, Rural Residential, and R-3, Urban Residential, zoning districts.

For the foregoing reasons, the following decree/order is entered.

## DECREE NISI

And now, this July 1, 1985, it is hereby ordered and decreed that plaintiff's request for a permanent injunction enjoining defendant from using the subject properties as group homes for moderately mentally retarded persons be, and the same hereby is, denied. Judgment is entered in favor of defendant.

The prothonotary shall give prompt notice of this decree nisi to the parties as required by Pennsylvania Rule of Civil Procedure 1517. Unless a motion for post-trial relief is filed within 10 days of the date of said notification, the prothonotary, upon praecipe, shall enter this decree nisi as the final decree pursuant to Pennsylvania Rule of Civil Procedure 227.4 and promptly notify the parties, or their counsel, of its entry in the manner provided by Pennsylvania Rule of Civil Procedure 236.